UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ALONZO KEARSE,

               Plaintiff,

       - against -

ATC HEALTHCARE SERVICES, MIRLENE MYRTHIL,
and JOSEPH TRAVELLA

              Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

12 Civ. 233 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    <u>Pro se</u> plaintiff Alonzo Kearse ("plaintiff") commenced this action against his former employer, ATC Healthcare Services ("ATC" or the "company"), and its employees Mirlene Myrthil and Joseph Travella, alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et. seq.</u> ("Title VII"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 <u>et seq.</u> (the "NYCHRL"). The Court dismissed with prejudice plaintiff's NYCHRL claim and his claims against the individual employees on April 5 and June 27, respectively. Therefore, only the Title VII claim against ATC remains. Presently before the Court is ATC's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"), or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). Because the Court considers

evidence presented beyond the pleadings, we rule only on the motion for summary judgment, which, for the reasons set forth herein, is granted.

## BACKGROUND[1]

Plaintiff was hired by ATC, a company located in Lake Success, New York, as a payroll coordinator in September 2009. Compl. at 2; Hoenings Aff., Ex. 6 at 9. Plaintiff's responsibilities as a payroll coordinator included processing checks for ATC employees who worked at the company's various branches. Hoenings Aff., Ex. 6 at 11-12. On November 29, 2009, Mirlene Myrthil ("Myrthil") became plaintiff's supervisor. Myrthil Aff. ¶ 3. Myrthil also supervised ATC's two other payroll coordinators, both of whom were women. Pl.'s Opp. at 3. Plaintiff claims that during the course of his employment, which ended on February 18, 2011, Myrthil subjected him to "harassment and gender discrimination." Compl. at 3.

According to plaintiff, Myrthil's alleged harassment and discrimination took the following forms: (1) Myrthil was less courteous and lenient with plaintiff than she was with the other two payroll coordinators, Pl. Opp. at 3-6; (2) she reprimanded

---

[1] The facts recited here are drawn from the following sources: (1) the complaint ("Compl."), filed January 11, 2012, and the documents attached thereto; (2) Defendant's Rule 56.1 Statement ("Def.'s R. 56.1"); (2) the Affidavit of Marie Ann Hoenings in Support of Defendant's Motion on the Pleadings and for Summary Judgment ("Hoenings Aff."), and the exhibits attached thereto; (3) the Affidavit of Mirlene Myrthil ("Myrthil Aff."), and the exhibits attached thereto; and (4) Plaintiff's Opposition to Defendant's Motion ("Pl.'s Opp."), and the documents attached thereto. For ease of reference, we cite throughout to the page numbers provided in the ECF header.

plaintiff and belittled his work performance in front of others, id. at 9; (3) in February 2011, she told plaintiff that the executive team, which consisted of her and three men, had decided to limit the number of paid vacation days -- which ATC referred to as "paid time off" or "PTO" -- he would be advanced before April because he had been abusing the vacation policy, although she said she would be willing to revisit that decision if there were extenuating circumstances, id. at 6, 10; Hoenings Aff., Ex. 1 at 10; (4) she was not responsive to plaintiff's concerns regarding problems with his paychecks, Pl. Opp. at 9; and (5) she "received a garnishment request to deduct child support payments out of [plaintiff's] check and she said that [plaintiff] should have married [his] sons [sic] mother and joked to Christine and told her that [plaintiff] was going to get married just to get out of paying child support," id. at 8.

Plaintiff complained about Myrthil's behavior on a number of occasions. On August 31, 2010, plaintiff sent an email to Joseph Travella ("Travella"), ATC's Human Resources Director, complaining about the way Myrthil treated him. Hoenings Aff., Ex. 1 at 14. He wrote: "I feel that Mirlene does not respect me as an employee or as a man. I do not think I receive the same treatment or courtesy as my co-workers Christine and Kathy." Id. Plaintiff then described specific instances in which Myrthil did not show him the respect he felt he deserved. These

included: (1) times when Myrthil discussed problems in payroll department meetings relating to plaintiff's work; (2) times when plaintiff felt like Myrthil "put [him] on the hot seat" when he made errors; (3) one time when Myrthil "brushed off" his concerns regarding how work relating to his assigned branches was managed; and (4) a comment Myrthil made to a coworker deriding plaintiff's performance. Id. at 14-15.

On January 31, 2011, plaintiff sent Travella another email complaining about Myrthil. Id. at 11. The subject line of this email was "Harassment." Id. In the email, plaintiff listed several incidents from October 2009 to January 2011 in which he claimed to have been mistreated by Myrthil. Id. These alleged incidents can be summarized as follows:

- October 2009: Myrthil blamed plaintiff for a mishandled garnishment that led to a lawsuit being filed against ATC, even though, according to plaintiff, he was not responsible for the error. Id.

- December 2009: Myrthil called attention to plaintiff's mistakes in front of others, but did not similarly shame his female coworkers. Id. On one occasion, while in the presence of a coworker, Myrthil told plaintiff that he made "a stupid mistake." Id.

- October 2010: While on the phone with plaintiff's coworker, Myrthil said that plaintiff "was working on the e-funds

yesterday and he mess [sic] it up but you know how Alonzo is, He [sic] mess everything up." Id. After plaintiff complained about this incident to Travella, Myrthil met with plaintiff to address his complaint. Id. However, plaintiff left Myrthil's office after approximately 45 minutes to tell Travella that his meeting with Myrthil "wasn't going well" and that "she was being condescending and antagonistic, and defensive." Id. Plaintiff returned to Myrthil's office to continue talking, and Myrthil kept him there for twenty minutes past when he needed to leave. Id. The following day, plaintiff came to work late and ate lunch at his desk, and Myrthil said she planned to "dock" him an hour for lunch because he had been away from his desk for a long period of time. Id. at 12.

- December 26, 2010: Myrthil allotted plaintiff's vacation time in ways he was unaware of and with which he disagreed. Id.

- January 21, 2011: Myrthil granted Myrthil's request to take two days off from work but told him that he was being advanced vacation days he had not yet earned in 2011. Id. Plaintiff and Myrthil proceeded to argue about the vacation policy, with Myrthil allegedly shouting and using a "nasty" tone. Id.

- January 31, 2011: Myrthil brought plaintiff his W-2 and paycheck, dropped them on his desk, and said, "You're welcome." Id. at 11.

Plaintiff concluded the email by saying that, despite his desire to resolve his issues with Myrthil, she "does not want to be professional and I do not see any consequences for her disrespecting me and do not see this issue going away anytime soon." Id. at 13. "Therefore," he wrote, "I feel like I'm left with no choice but to file a claim with the EEOC as my work environment has now become uncomfortable." Id.

The next day, on February 1, 2011, plaintiff sent an email to the EEOC, copying Myrthil, Travella, and two ATC chief executive officers. Id. at 10. The subject line of the email read, "Timesheet." Id. Plaintiff began the email by writing that "Mirlene Myrthil continues to make my work environment very uncomfortable and does not maintain her professionalism." Id. He then described a disagreement he had with Myrthil in which he claimed that her application of PTO on his timesheets was inconsistent and incorrect and that she was unfairly restricting use of his unaccrued PTO. Id. He further claimed that she was short-tempered with him and disregarded his questions about PTO. Id. Finally, he wrote, "I have told Mirlene several times that while I understand she is my boss, I will not allow her to

disrespect, mistreat or bully me under any circumstances and this behavior has gone for [sic] over a year now." Id.

Two weeks later, on February 14, 2011, Myrthil issued plaintiff a warning notice regarding his work performance. Myrthil Aff., Ex. 1 at 2. The notice detailed numerous mistakes plaintiff had made and discussed his continuing failure to follow directions, inability to accept criticism, and insubordination. For example, the notice described the following incident from the previous week:

> On Tuesday 02/08/11, I had e-mailed you around 5:00 PM asking you to send an e-mail to your branches and let them know that you will not be in on Wednesday 02/09/11, and to please copy me on that e-mail. It has been a battle for you to understand that I request to be copied on certain e-mails; you have constantly ignored my requests. I was able to catch you leaving the office around 5:30PM; your computer was already turned off. I called you back because you wrote your timesheet incorrectly. Then I realized that you never did copy me on the "Out of Office" e-mail. When I questioned you, you started yelling at me, telling me that "I just simply forgot and why can't I forget things when you also always forget things". In addition, you stated, "Why should I show respect to you, and that if what I am looking for is respect, you will not get it from me." – (Quoting you the best that I can…)

Id. at 3. The notice also listed several complaints made against plaintiff by franchise owners and managers of his assigned branches. Finally, the notice warned that "if there is

no immediate, continued and substantial improvement in your overall work performance, you will be subject to further disciplinary action, up to and including the termination of your employment." Id. at 5.

Shortly after receiving the warning notice, plaintiff wrote a letter in response arguing that although he had done many of the things Myrthil described, several of her claims were exaggerated or taken out of context. Myrthil Aff., Ex. 2 at 2-8. However, he did concede at his deposition that he made mistakes at work "from time to time." Hoenings Aff., Ex. 6 at 17.

Plaintiff's conflict with Myrthil came to a head on Friday, February 18, 2011. That day, in the early afternoon, plaintiff became frustrated that he had not received his paycheck, which he had been expecting at approximately 11:00 AM. Id. at 28; Pl. Opp. at 14. The reason for the delay was that an adjustment had to be made to the paycheck because plaintiff had requested that one of his planned vacation days be switched to another day. Pl. Opp. at 10, 14, 32. Plaintiff claims that he went to Myrthil's office at 1:00 PM to ask about the paycheck and she told him, "I can't give you your check, because something is wrong with it." Id. at 14. According to Travella, plaintiff would have received his paycheck less than an hour later if he had waited for Myrthil to make the necessary adjustment. Id. at

32.  However, at 1:13 PM, plaintiff sent Myrthil a two-line email which read: "My check is being withheld. I am ready to turn in my parking permit and my key." Hoenings Aff., Ex. 7 at 2.  Myrthil directed him to the office of ATC's Controller, Michael Goldberg.  Hoenings Aff., Ex. 6 at 29; Pl. Opp. at 32. Shortly thereafter, at approximately 1:30 PM, plaintiff walked into Goldberg's office, "tossed" his parking permit and, according to Myrthil and Travella, his access key, and left the building.  Hoenings Aff., Ex. 6 at 28-30; Myrthil Aff. at 2; Pl. Opp. at 32.  He did not return to work that day. Hoenings Aff., Ex. 6 at 28.

Plaintiff testified that he came into the office the following Tuesday -- Monday was a holiday -- at 10:00 AM, an hour after the workday began.  Id. at 28-29.  Although neither plaintiff nor ATC explain what occurred after that, it is undisputed that plaintiff's employment at ATC ended the day he walked out.  Plaintiff was later denied unemployment insurance based on a finding by the Unemployment Insurance Appeal Board that he had voluntarily quit.  Pl. Opp. at 17, 32.

On October 12, 2011, the EEOC dismissed plaintiff's charge of employment discrimination and notified him of his right to sue.  Compl. at 5.  The Dismissal and Notice of Rights letter stated that an EEOC investigator was "unable to conclude that

the information obtained establishe[d] violations" of Title VII.
Id.

On January 11, 2012, plaintiff filed the instant action.
In his complaint, plaintiff alleges that ATC violated Title VII
by subjecting him to unequal terms and conditions of employment,
harassment, and retaliatory termination.  Id. at 2-3.

**DISCUSSION**

**I.  Legal Standards**

A motion for summary judgment is appropriately granted when
there is no genuine issue as to any material fact and the moving
party is entitled to judgment as a matter of law.  FED. R. CIV. P.
56(a).  In this context, "[a] fact is 'material' when it might
affect the outcome of the suit under governing law," and "[a]n
issue of fact is 'genuine' if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir.
2007) (internal quotation marks and citations omitted).  "In
assessing the record to determine whether there is [such] a
genuine issue [of material fact] to be tried, we are required to
resolve all ambiguities and draw all permissible factual
inferences in favor of the party against whom summary judgment
is sought."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93,
101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 255 (1986)).  On a motion for summary judgment, "[t]he

moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson, 477 U.S. at 249). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" Gorzynski, 596 F.3d at 101 (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). However, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted). Indeed, it is well established that "summary judgment may be appropriate even in the fact-intensive context of discrimination

11

cases." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001). <u>See also Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir.), <u>cert. denied</u>, 474 U.S. 829 (1985) ("Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation.").

Because plaintiff is proceeding <u>pro se</u>, we conduct our examination with special solicitude and interpret his submissions "to raise the strongest arguments that they suggest." <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted). Nonetheless, he "must still be held to the normal requirements of summary judgment, and 'bald assertion[s],' unsupported by evidence, will not overcome a motion for summary judgment." <u>Sesay-Harrell v. New York City Dep't of Homeless Servs.</u>, 2013 U.S. Dist. LEXIS 170160, at *30 (S.D.N.Y. Dec. 2, 2013) (brackets in original) (quoting <u>Carey v. Crescenzi</u>, 923 F.2d 18, 21 (2d Cir. 1991)).

## II. <u>Application</u>

Plaintiff claims that ATC violated Title VII by discriminating against him on the basis of his gender, creating a hostile work environment through harassment, and retaliating

against him for filing an EEOC complaint.  We address these claims in turn.

## A.    Gender Discrimination

Claims of gender discrimination under Title VII are analyzed through the three-step evidentiary burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first establish a prima facie case by showing that "(1) []he was within [a] protected class; (2) []he was qualified for the position; (3) []he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009).  If the plaintiff makes his prima facie case, the burden of production shifts to "the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802.  If the employer meets that burden, the plaintiff must then raise a triable issue of fact as to whether the employer's legitimate, nondiscriminatory reason was merely pretextual.  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

### 1.    Prima Facie Case

"Although the burden of proof in establishing a prima facie case is 'minimal,' it is not non-existent."  Dumay v. City of

*New York*, 2011 U.S. Dist. LEXIS 118932, at *20 (S.D.N.Y. Oct. 14, 2011) (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)). Plaintiff has failed to meet even this low threshold because he has not adequately alleged an adverse employment action.

An employee sustains an adverse employment action if he "endures a materially adverse change in the terms and conditions of employment." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted). To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Examples of such a change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).

Plaintiff alleges that Myrthil took adverse actions against him by: (1) terminating him; (2) issuing him a warning notice; (3) temporarily restricting his, but not his female coworkers', use of unaccrued paid vacation days; (4) unfairly criticizing and reprimanding him; and (5) not allowing him the flexibility and autonomy she allowed his two female coworkers. However,

none of the actions taken by Myrthil qualify as materially adverse.

First, there is no evidence supporting plaintiff's contention that he was terminated. On the contrary, his deposition testimony and email to Myrthil reveal that he effectively resigned on February 18, 2011. Indeed, after notifying Myrthil that he was "ready to turn in my parking permit and my key," Hoenings Aff., Ex. 7 at 2, because he was frustrated that his paycheck had not arrived on time, he surrendered at least his parking permit and left work in the middle of the day. Hoenings Aff., Ex. 6 at 28-30. Given this behavior and the fact that he did not contact his supervisors or return to the office until 10:00 AM the following Tuesday, it was reasonable for ATC to conclude that he had voluntarily quit. Plaintiff even acknowledged the reasonableness of this conclusion at his deposition.[2] Id. at 29. His argument that ATC effectively terminated him when it temporarily withheld his paycheck is without merit. See id.; Pl. Opp. at 10-15. Delaying delivery of a paycheck by a few hours, especially when the reason is to fix a problem with it, is in no way equivalent

---

[2] The decision by the Unemployment Insurance Appeal Board to deny plaintiff unemployment insurance because he was not fired certainly supports the conclusion that he quit. Even if he did not intend to quit, his behavior on February 18, 2011 provided a legitimate, nondiscriminatory reason for ATC to have terminated his employment. And plaintiff has offered no evidence to suggest that if he was terminated, it was because of his gender rather than his unprofessional behavior.

to termination.  And it is certainly not an adverse employment action.

Second, where, as here, a warning notice does not lead to any tangible harm or consequence, its issuance does not constitute an adverse employment action.  See, e.g., Siddiqi v. New York City Health & Hosps. Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("negative evaluations, standing alone without any accompanying adverse results, are not cognizable") (internal citation omitted); Bowles v. N.Y. City Transit Auth., 2006 U.S. Dist. LEXIS 32914, at *34-35 (S.D.N.Y. May 23, 2006) ("In this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII." (collecting cases)). Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (finding that plaintiff's receipt of a written reprimand warning that repetition of improper behavior could result in disciplinary action was not an adverse employment action); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."), aff'd, 205 F.3d 1327 (2d Cir. 2000).  Because the warning notice plaintiff received did not result in any negative

consequences, it cannot be considered an adverse employment action. <u>Brown</u>, 673 F.3d at 150.

The remaining actions alleged by plaintiff -- that Myrthil restricted his use of PTO, unfairly criticized and reprimanded him, and did not grant him flexibility and autonomy at work -- are similarly inadequate. <u>See, e.g.,</u> <u>Weeks v. New York State (Div. of Parole)</u>, 273 F.3d 76, 86 (2d Cir. 2001) (criticizing an employee not an adverse employment action), <u>abrogated on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002); <u>Sesay-Harrell v. New York City Dep't of Homeless Servs.</u>, 2013 U.S. Dist. LEXIS 170160, at *44-45 (S.D.N.Y. Dec. 2, 2013) (not paying employee when she was marked absent without leave for a day, speaking to employee in demeaning manner, and requiring employee to inform supervisor when she left her desk not adverse employment actions); <u>Kaur v. New York City Health & Hosps. Corp.</u>, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("denial of vacation time . . . do[es] not rise to the level of an adverse employment action"); <u>Gutierrez v. City of New York</u>, 756 F. Supp. 2d 491, 508 (S.D.N.Y. 2010) (refusing to grant days off and requiring that employees adhere more strictly to the dress code than their white colleagues not adverse employment actions); <u>Smalls v. Allstate Ins. Co.</u>, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (yelling at and unfairly criticizing employee and giving unfavorable schedules and work assignments not

adverse employment actions); <u>Nicastro v. Runyon</u>, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) (excessively scrutinizing employee and requiring documentation for sick leave not adverse employment actions).

Had plaintiff been prevented from using PTO that he had earned, he could plausibly argue that he suffered an adverse employment action. However, not only was plaintiff complaining about PTO he had not yet accrued, he was never actually denied any of the days off that he requested. <u>See</u> Hoenings Aff., Ex 6 at 22-23; Pl. Opp. at 29. Moreover, Myrthil told plaintiff that she would be willing to reconsider the temporary restriction on his use of unaccrued PTO if there were extenuating circumstances. Hoenings Aff., Ex. 1 at 10.

Therefore, in sum, because plaintiff has not alleged an adverse employment action, his gender discrimination claim cannot survive summary judgment.

**B.    Hostile Work Environment**

Plaintiff also alleges that he experienced a hostile work environment. In order to survive summary judgment on a hostile work environment claim, a plaintiff must produce evidence that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys.</u>, 510 U.S.

17, 21 (1993) (internal quotations marks and citation omitted). This test contains both objective and subjective elements; plaintiff must show that the objectionable conduct "(1) [was] objectively severe or pervasive -- that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. N.Y. 2007) (internal quotation marks and ellipses omitted).

Courts examine the "totality of the circumstances" to determine whether a plaintiff's work environment is sufficiently hostile to support a hostile work environment claim. Pucino v. Verizon Communs., Inc., 618 F.3d 112, 117 (2d Cir. 2010). Among the factors courts consider are: "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 319 (2d Cir. 1999) (citing Harris, 510 U.S. at 23). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Therefore, "a plaintiff alleging a hostile work environment must demonstrate

either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Id. (internal quotation marks omitted); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that "we have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment").

Plaintiff claims that Myrthil created a hostile work environment by harassing him in the following ways: (1) she "repeatedly reprimanded [plaintiff] as well as stated harsh things about [him] as it related to [his] work performance to other employees," Pl. Opp. at 9; (2) one evening, she kept plaintiff in her office twenty minutes past the time when he needed to go pick up his son so that she could discuss a complaint he had filed against her, id. at 9; Hoenings Aff., Ex. 1 at 11; (3) she ignored his questions about why certain of his paychecks were lower than expected, Pl. Opp. at 9; (4) she and three male executives decided to limit the amount of unaccrued PTO he could use in February and March 2011 because they believed he had been abusing the PTO policy, Pl. Opp. at 10, 13; and (5) she made a comment that plaintiff should have married his son's mother and joked that he was going to get married to avoid paying child support, id. at 8.

These alleged acts of harassment are not sufficient to demonstrate a hostile work environment under Title VII. Although they may have created a tense and unpleasant atmosphere in which to work, they are not severe or pervasive enough to be actionable. See Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008) ("derogatory language," "dismissive comments," and "intense scrutiny" insufficient to make out hostile work environment claim); Chukwueze v. NYCERS, 891 F. Supp. 2d 443 (S.D.N.Y. 2012) (granting motion to dismiss where plaintiff alleged three incidents over the course of a year where he was chastised and berated in front of his coworkers); De La Cruz v. City of New York, 783 F. Supp. 2d 622, 644-45 (S.D.N.Y. 2011) (allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and supervisor's stray remarks regarding seniority and physical fitness insufficient to establish hostile work environment). Indeed, "a hostile work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment." Castagna v. Bill Luceno & Majestic Kitchens, Inc., 2013 U.S. Dist. LEXIS 14932, at *25 (S.D.N.Y. Feb. 4, 2013) (internal quotation marks omitted).

Furthermore, while Myrthil's stray comment about plaintiff paying child support may have been inappropriate and embarrassing, it was not so severe as to materially alter the

conditions of his employment. See Raum v. Laidlaw, Ltd., 173 F.3d 845 (2d Cir. 1999) (summary order) (affirming dismissal of hostile work environment claim where supervisor "repeatedly subjected [plaintiff] to obscene gestures and comments which caused [him] embarrassment and humiliation"); McGrath v. Reuters, 2012 U.S. Dist. LEXIS 81447, at *48-49 (S.D.N.Y. Apr. 30, 2012) (publicly humiliating plaintiff by tracking the number of times he went to the bathroom not actionable); Chau-Kun Shih v. City of New York, 2006 U.S. Dist. LEXIS 70483 (S.D.N.Y. Sept. 27, 2006) (incident involving a humiliating photograph of plaintiff insufficient to establish hostile work environment).

In sum, because plaintiff has not raised a genuine dispute of material fact with regard to his hostile work environment claim, ATC is entitled to summary judgment on that claim.

## C. Retaliation

Finally, plaintiff's complaint also includes a claim for retaliation. Title VII contains an anti-retaliation provision which "prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011) (citing Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56-59 (2006)). A "materially adverse action" is one that "might have

22

dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (internal quotation marks omitted).

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). First, plaintiff must establish a prima facie case by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Id. (internal quotation marks omitted). If plaintiff establishes a prima facie case, the defendant has the burden of articulating a legitimate, non-retaliatory reason for the adverse action, whereupon the burden shifts back to the plaintiff to establish, "through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013).[3]

Plaintiff claims that ATC retaliated against him for filing a complaint with the EEOC by issuing him a warning notice two

---

[3] The Supreme Court recently clarified that plaintiffs pursuing Title VII claims have to prove at trial that their "protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013). However, we need not address any differences between this standard and the one stated in Summa because that distinction is not dispositive in this case.

weeks after the complaint and temporarily withholding his paycheck four days after that. Pl. Opp. 6-8. Plaintiff's retaliation claim fails because, even assuming that he can make out a prima facie case, he has not demonstrated that the legitimate, non-retaliatory reasons offered by ATC for the challenged actions are pretextual.

### 1. Warning Notice

ATC asserts that the warning notice issued to plaintiff on February 14, 2011 was a legitimate response to plaintiff's repeated performance problems and disobedience, and not retaliation for his EEOC complaint. ATC has articulated valid reasons for issuing the warning notice: plaintiff made numerous mistakes (many of which he acknowledged in his response letter and deposition testimony), he did not take direction from his supervisor, and there had been complaints about him by branch managers and owners. Cf. Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996) (holding that being disruptive, causing complaints, and not taking direction from supervisors "are all legitimate reasons for firing an employee"). Given the history and persistent nature of plaintiff's performance problems, ATC has satisfied its burden of articulating a legitimate, non-retaliatory reason for issuing the notice.

The burden thus shifts back to plaintiff to prove that ATC's articulated rationale is pretextual. In his attempt to do

so, he argues that: (1) only fourteen days separated the warning notice and his EEOC complaint, (2) he had never previously received a performance review in the year and a half he worked at the company, and (3) several of the mistakes mentioned in the notice were minor and/or occurred many months earlier. However, aside from the relatively small time gap between the EEOC complaint and the warning notice, the other facts cited by plaintiff do not indicate that ATC's stated rationale is pretextual. And it is well-settled that temporal proximity, without more, is insufficient to satisfy plaintiff's burden of establishing pretext. <u>Simpson v. N.Y. State Dep't of Civil Servs.</u>, 166 Fed. Appx. 499, 502 (2d Cir. 2006) (summary order).

First, regardless of whether plaintiff had ever received a performance review in the past, it is undisputed that he had been reprimanded for his performance problems on many occasions. In fact, in the warning notice itself, Myrthil stated that she had "spoken to [plaintiff] about each of the above situations at the time they occurred." Myrthil Aff., Ex. 1 at 3. Thus, the allegations regarding plaintiff's poor performance and behavior did not suspiciously arise for the first time after he filed his EEOC complaint. Plaintiff has not shown that issuing a written warning notice was an unreasonable measure to take, especially given that Myrthil's previous attempts to discuss problems with him in person were met with resistance and hostility. Indeed,

the notice explained: "[I]t is difficult to talk to you when such issues are brought to your attention. The situation with you seems to escalate more and more everyday [sic]." Id.

Second, plaintiff's argument that a retaliatory motive can be inferred from the allegations of minor and months-old mistakes is similarly unavailing. Although certain mistakes may have seemed trivial to plaintiff, they could have been very aggravating for his supervisors, coworkers, and branch employees, particularly if they were occurring frequently, which the notice claimed they were. Regardless, even assuming that the mistakes were minor, a warning notice is not an especially drastic response.

As for the performance problems that occurred several months earlier, their inclusion in the warning notice is logical and not necessarily indicative of retaliatory intent either. When discussed together with plaintiff's recent problems, they underscore the message that plaintiff had an extensive history of poor performance and insubordination which he failed to correct.

Lastly, to the extent that plaintiff is suggesting that documentation of an employee's deficient work performance is itself an adverse employment action, that suggestion must be rejected. The memorialization of issues related to an

employee's work performance has clear benefits for employer and employee alike.

### 2. Delayed Paycheck

Plaintiff also fails to show that the delay in the delivery of his paycheck on February 18, 2011 was retaliatory. As an initial matter, such a delay, which was only a few hours, does not qualify as an adverse employment action. Indeed, there was no indication that plaintiff was going to be denied his paycheck. He merely had to wait until later in the workday to receive it. "[M]inor annoyances" like this do "not give rise to actionable retaliation claims." <u>Millea v. Metro-North R. Co.</u>, 658 F.3d 154, 165 (2d Cir. 2011) (internal quotation marks omitted).

Moreover, even assuming <u>arguendo</u> that the brief delay constituted an adverse action, plaintiff offers no evidence disproving ATC's legitimate, non-retaliatory reason for it, which was that an adjustment had to be made because plaintiff had switched vacation days.

In conclusion, plaintiff has not presented evidence upon which a reasonable juror could conclude that ATC retaliated against him for filing a complaint with the EEOC. Therefore, ATC is entitled to summary judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, ATC's motion for summary
judgment (docket no. 27) is granted in its entirety.

Dated:   New York, New York
         March 11, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to
the following:

### Plaintiff

Alonzo Kearse
486 Brooklyn Avenue, #E17
Brooklyn, NY 11225

### Attorney for Defendants

Marie Ann Hoenings, Esq.
L'Abbate, Balkan, Colavita & Contini, LLP
1001 Franklin Avenue, 3rd Floor
Garden City, New York 11530